JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DAVID D. GAGNIER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>SITEONE LANDSCAPE SUPPLY LLC and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: SACV 21-01834-CJC (DFMx)<br><br>ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; ATTORNEYS' FEES, COSTS, SERVICE AWARD, AND ADMINISTRATION COSTS [Dkt. 40] |

## I.    INTRODUCTION

In this putative class action, Plaintiff David D. Gagnier brings various wage-and-hour claims under California's labor laws against Defendant SiteOne Landscape Supply LLC and unnamed Does.  Those claims include (1) failure to pay wages due, (2) failure to provide compliant meal periods, (3) failure to provide compliant rest periods,

(4) failure to pay timely wages under California Labor Code Section 203, (5) failure to timely pay wages under California Labor Code Section 204, (6) failure to furnish in a timely manner accurate itemized wage statements, (7) failure to indemnify necessary business expenses, and (8) violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210.  (*See* Dkt. 36 [Second Amended Complaint, hereinafter "SAC"].)  Plaintiff also brings (9) a representative action for civil penalties for violating the state's labor laws under the Private Attorneys General Act of 2004 ("PAGA"), Cal. Lab. Code §§ 2698–2699.8.  (*See id.*)  Now before the Court is Plaintiff's unopposed motion for final approval of the class action settlement and attorneys' fees, costs, service award, and administration costs.  (*See* Dkt. 40 [Notice of Motion and Motion for Final Approval of Class Action Settlement; Attorneys' Fees, Costs, Service Award, and Administration Costs]; Dkt. 40-1 [Memorandum, hereinafter "Mot."].)  For the following reasons, Plaintiff's motion is **GRANTED IN SUBSTANTIAL PART**.

## II.   BACKGROUND

### A.   Factual Allegations

Defendant is a landscape supply company.  (SAC ¶ 10.)  Plaintiff alleges that from August 2019 to December 2020, he worked as a delivery driver for Defendant.  (*Id.* ¶ 9.)  Plaintiff's duties included picking up and delivering items to various locations and driving a truck with a forklift.  (*Id.*)  Plaintiff asserts that Defendant employed him and other individuals throughout California in non-exempt positions for hourly compensation.  (*Id.* ¶¶ 24, 28.)

According to Plaintiff, he and other non-exempt employees experienced various violations of California's wage-and-hour laws.  For example, Defendant had a policy of not paying overtime wages or the correct rate of overtime wages.  (*Id.* ¶ 38.)  Employees

frequently worked over eight hours a day or over forty hours a workweek without being properly paid for such work at the correct overtime rate of pay. (*Id.* ¶ 31.) Defendant failed to properly calculate employees' regular rate of pay by failing to include all forms of compensation, such as bonuses, incentives, and commissions. (*Id.* ¶ 32.) Defendant also failed to regularly provide employees with meal or rest periods as required by law, and to provide meal or rest periods uninterrupted by texts and calls from supervisors. (*See id.* ¶¶ 33–37, 41–43.) Defendant further had a policy or practice of not adequately reimbursing or indemnifying employees for expenses, such personal cell phone usage to speak with supervisors. (*Id.* ¶ 45.) Finally, Defendant failed to provide employees with accurate, itemized wage statements, including accurate information on wages, hours, and applicable rates of pay, and to pay all wages upon termination. (*Id.* ¶ 46.) These practices amounted to unlawful, unfair, or fraudulent business practices that allowed Defendant to gain an advantage over competitors. (*Id.* ¶ 104.)

## B.    Proposed Settlement Terms

The proposed settlement agreement resulted from a private mediation on June 15, 2022, before mediator Louis Marlin, who has experience mediating both class action and employment disputes. (*See* Dkt. 40-3 [Declaration James R. Hawkins, hereinafter "Hawkins Decl."] ¶ 16.) To facilitate the mediation, Defendant provided Plaintiff with its time and payroll records for the class members during the class period, as well as copies of its timekeeping, meal period, and rest break policies. (*See id.* ¶¶ 12–13.)

As part of the settlement, Defendants have agreed to pay a non-reversionary Gross Settlement Amount ("GSA") of $800,000, from which certain expenses are deducted to yield the Net Settlement Amount of $430,834. (*See id.* Ex. 1 [Joint Stipulation of Class Action Settlement and Release, hereinafter "Agreement"] art. III, ¶ 16. Each class member's payment will be a prorated portion of the Net Settlement Amount based on the

number of Compensable Work Weeks[1] the class member worked in proportion to the aggregate number of Compensable Work Weeks worked by all class members. (*See id.* art. III, ¶ 18.) $50,000 of the Gross Settlement Amount will be allocated as the PAGA settlement, with 75% paid to the Labor and Workforce Development Agency ("LWDA"). (*See id.* art. III, ¶ 19.) The remaining 25% will be allocated based on the number of workweeks that each employee was a PAGA group member. (*See id.*) Ultimately, the average payment to class members is approximately $400. (Mot. at 8.) For tax purposes, 20% of each individual's settlement payment constitutes wages, with the rest deemed penalties and interest. (*See id.* art. III, ¶ 17.) Defendants will separately pay employer payroll taxes on the wages. (*See id.* art. I, ¶ 17.) Any uncashed checks for individual settlement amounts will be transmitted to the State of California Office of the Controller Unclaimed Property Fund in the name of the class member who did not cash his or her check. (*See id.* art. III, ¶ 22.) If the Court does not approve an escheatment process for the uncashed funds, the parties will meet and confer to identify an appropriate *cy pres* recipient for any unclaimed funds. (*See id.*)

As noted, certain deductions from the GSA are made before apportionment and distribution. (*See id.* art. III, ¶ 16.) These deductions include administrative costs incurred by the settlement administrator, not to exceed $20,000. (*See id.*) Also deducted are attorneys' fees and costs, not to exceed thirty-three and one third percent of the GSA, (*see id.* art. III, ¶ 24), and Plaintiff's requested incentive award of $7,500, (*see id.* art. III, ¶ 23). Finally, the PAGA portion of the settlement that will be distributed to the LWDA (totaling $37,500) is deducted from the GSA. (*See id.* art. III, ¶ 28.)

---

[1] "Compensable Work Weeks" are the number of weeks in which Settlement Class Members were employed as non-exempt employees for Defendant in California between July 30, 2017, through August 15, 2022, based on information from Defendant's internal and currently available electronic timekeeping and HRIS records. (*See id.* art. I, ¶¶ 6, 9.)

In exchange for Defendant's settlement payments, class members release "Defendant and any of its former and present parents, subsidiaries, affiliates, officers, directors, employees, partners, shareholders, attorneys, agents, successors, assigns, or legal representatives," (*id.* art. I, ¶ 34), of all "Released Class Claims," (*see id.* art. III, ¶ 32).

> "Released Class Claims" means any and all claims, causes of action, and factual or legal theories that were alleged in the Complaint, or reasonably could have been alleged based on the facts and legal theories of the Complaint during the Class Period, including all of the following claims for relief: (a) failure to provide meal periods and to properly provide premium pay in lieu thereof; (b) failure to provide rest periods and to properly provide premium pay in lieu thereof; (c) failure to pay all wages timely at the time of termination and/or during employment; (d) failure to provide complete, accurate or properly formatted wage statements; (e) failure to indemnify necessary business expenses, (f) unfair business practices that could have been premised on the claims, causes of action or legal theories based on the Complaint; (g) all claims under the California Labor Code Private Attorneys General Act of 2004 that are alleged in the Complaint including the proposed Second Amended Complaint or reasonably could have been alleged based on the facts and legal theories contained in the Second Amended Complaint; and (h) all damages, penalties, interest, and other amounts recoverable under each of the preceding claims, causes of action, or legal theories of relief

(*Id.* art. I, ¶ 32.)

The PAGA group members and the State of California also release the same individuals and entities of "Released PAGA Claims." (*See id.* art. I, ¶ 33.)

> "Released PAGA Claims" means any and all claims, causes of action, and factual or legal theories that were alleged in the Second Amended Complaint, or reasonably could have been alleged based on the facts and legal theories of the Second Amended Complaint during the PAGA Period for civil penalties pursuant to the PAGA for Defendant's alleged failure to: (a) pay wages including overtime, (b) provide proper meal periods, and to properly provide premium pay in lieu thereof; (c) provide rest periods and to properly provide premium pay in lieu thereof; (d) failure to pay all wages

earned and owed upon separation from Defendant's employ, (e) failure to provide complete, accurate or properly formatted wage statements, and (f) failure to reimburse expenses.

(*Id.*)

The Agreement also provided a plan for class notice.  (*See id.* art. III, ¶ 8.)  Under the plan, the administrator, ILYM Group, Inc. ("ILYM"), was to send a form notice by first-class U.S. mail describing the terms of the Agreement and procedures to opt-out and object, as well as an estimate of each class member's share of the Net Settlement Amount.  (*See id.* art. I, ¶ 21; Dkt. 42 [Supplemental Declaration of Nick Castro of ILYM Group, Inc., hereinafter "Castro Decl."] ¶¶ 3, 7.)  The names, addresses, and other information necessary to effectuate notice came from Defendant's internal electronic timekeeping, payroll, and HRIS records.  (*See* Agreement art. I, ¶ 4., Castro Decl. ¶ 5.)  These ultimately resulted in a class list of 1,150 individuals.  (Castro Decl. ¶ 5.)

On June 6, 2023, the Court conditionally certified a class and preliminarily approved the Agreement.  (Dkt. 39 [Order Granting Plaintiff's Motion for Preliminary Approval of Class Action Settlement, hereinafter "Order"].)  ILYM then gave notice to the class members.  (Castro Decl. ¶¶ 7–9.)  The deadline to object or opt out was September 5, 2023.  As of September 15, 2023, ILYM received only two requests for exclusion, and no one objected to the settlement.  (Castro Decl. ¶¶ 11–12.)[2]

---

[2] The parties sent additional notices to class members and state and federal officials addressing the Court's concerns involving compliance with statutory notice requirements.  (See 43 [Order Directing Parties to Demonstrate Compliance with Order Granting Plaintiff's Motion for Preliminary Approval of Class Action Settlement]; Dkt. 46 [Declaration of Aaron H. Cole Regarding Notice of Proposed Class Action Settlement Provided Pursuant to 28 U.S.C. § 1715]; Dkt. 47 [Supplemental Declaration of James Hawkins in Support of Plaintiff's Motion for Final Approval of Class Action Settlement].)

### III.   DISCUSSION

In deciding whether to grant the motion for final approval, the Court analyzes (1) whether to certify a class for purposes of settlement, (2) the fairness of the settlement, and (3) the class's response to the notice regarding the Agreement.

### A.   Class Certification Requirements

A plaintiff seeking class certification must satisfy two requirements under Federal Rule of Civil Procedure 23: (1) Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) the requirement that the action fall within one of the three "types" of classes described in Rule 23(b)'s subsections.  In this case, Plaintiff seeks certification under Rule 23(b)(3), which allows certification if a court "finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  The Court previously concluded that Plaintiff presented sufficient evidence to show that the proposed class satisfies the Rule 23(a) and (b)(3) requirements.  (*See* Order at 6–12.)  Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only.  *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has change to disturb [the Court's prior] conclusion, and class certification remains appropriate.").

### B.   Class Settlement Agreement Requirements

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*,

151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e).  A district court may approve a class action settlement only when it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  A court must consider whether "(A) the class representatives and class counsel have adequately represented the class[,] (B) the proposal was negotiated at arm's length[,] (C) the relief provided for the class is adequate[,] and (D) the proposal treats class members equitably relative to each other." *Id.* 23(e)(2)(A)–(D).  In determining whether the class's relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).

When, "as here, a settlement agreement is negotiated *prior* to formal class certification," the settlement "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Jones v. GN Netcom, Inc.* (*In re Bluetooth Headset Prod. Liab. Litig.*), 654 F.3d 935, 946 (9th Cir. 2011).  Courts must be wary of "'subtle signs' of collusion," such as "(1) when counsel receive a disproportionate distribution of the settlement[,] (2) when the parties negotiate a 'clear sailing' arrangement (i.e., an arrangement where defendant will not object to a certain fee

request by class counsel)[,] and (3) when the parties create a reverter that returns unclaimed funds to the defendant." *SFBSC Mgmt.*, 944 F.3d at 1049 (cleaned up).

## 1.   Adequacy of Class Representative and Class Counsel

Plaintiff and class counsel have adequately represented the class.  There is no evidence of a conflict of interest between Plaintiff and the other members of the class—his claims are the same as those of the other class members and he has every incentive to vigorously pursue those claims.  Plaintiff's attorneys likewise are adequate.  They are active practitioners who are experienced in wage-and-hour class actions.  (*See* Hawkins Decl. ¶ 48.)  The record also indicates that counsel engaged in extensive discovery, including obtaining and reviewing "the number of current and former putative class members who worked during the relevant time period; Defendant's operational structure, Defendant's timekeeping, meal period and rest break policies; documents evidencing Defendant's communications, training materials, and procedures for managing payment for all hours worked, meal periods and rest breaks; electronic time and pay records for putative class members which included approximately 441,000 work shifts; meal attestations, meal period premiums, and other relevant information, including Plaintiff's personnel and payroll file."  (*Id.* ¶ 13.)  Counsel further conducted numerous conferences with Defendant "regarding the allegations in the litigation and Defendant's practices relating to putative class members working in California," (*id.* ¶ 12), and participated in a full-day private mediation with Defendant culminating in this settlement, (*see id.* ¶ 16).

## 2.   Arm's Length Negotiations

The settlement appears to be the result of arms-length negotiations between the parties.  Negotiations occurred before a neutral private mediator.  *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (explaining that although

the "mere presence of a neutral mediator . . . is not on its own dispositive," it is "a factor weighing in favor of a finding of non-collusiveness"). The Agreement does not mandate reversion to Defendant of unclaimed funds or unawarded attorneys' fees, award a disproportionate share of attorneys' fees, or contain a clear sailing arrangement. In other words, the Agreement lacks any of the "'subtle signs' of collusion" that courts must police. *See SFBSC Mgmt*, 944 F.3d at 1049 (citation omitted).

### 3. Adequacy of Relief

#### a) Costs, Risks, and Delay of Trial and Appeal

Plaintiff would face significant risks in maintaining this action. For example, a factfinder could conclude that Defendant's wage statement errors were not made knowingly and intentionally, or that the errors caused little or no injury. *See* Cal. Lab. Code § 226(e)(1) ("An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with" wage-statement requirements "is entitled to recover the greater of all actual damages or" statutory penalties). A factfinder could also conclude that Defendant had policies and practices consistent with their legal obligations. For its part, Defendant maintains that employees were provided meal and rest periods and were aware of their right to breaks. (*See* Dkt. 38 [Notice of Motion and Motion for Preliminary Approval of Class Action Settlement Agreement]; Dkt. 38-1 [Memorandum] at 9.) Defendant asserts that these facts are supported by attestations from numerous employees regarding its timekeeping and meal and rest periods. (*See id.*) Finally, there are risks that the class would not be certified or would later be decertified because individual issues of employer or supervisor conduct, for example, would ultimately predominate over common issues. (*See id.* at 10–11); *see also In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district

court could decertify a class at any time is one that weighs in favor of settlement." (citation omitted)).

"The [s]ettlement eliminates these risks by ensuring [c]lass [m]embers a recovery that is 'certain and immediate, eliminating the risk that class members would be left without any recovery . . . at all.'" *Graves v. United Indus. Corp.*, 2020 WL 953210, at *7 (C.D. Cal. Feb. 24, 2020) (last alteration in original) (citation omitted); *see also In re Cobra Sexual Energy Sales Pracs. Litig.*, 2021 WL 4535790, at *6 (C.D. Cal. Apr. 7, 2021).  Because of this settlement, on average, class members will receive $400.  (Mot. at 8.)  The elimination of these risks strongly supports the adequacy of the settlement.

### b)    Effectiveness of Proposed Method of Distributing Relief

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id.*

The parties' proposed method of distribution is appropriately tuned to ensure class members receive relief.  Class membership and individual settlement amounts will be established from Defendant's records.  (*See* Castro Decl. ¶ 14.)  The individual payments will be calculated by determining the prorated share of each individual's total number of workweeks as reflected in Defendants' records.  (*See* Agreement art. III, ¶ 18.)  Class members may dispute the accuracy of the sums that ILYM calculates.  (*See id.* art. III, ¶ 10.)  ILYM will also be required to mail the individual settlement checks.  (*See id.*

art. III, ¶ 8.)  ILYM used the last known addresses of class members based on Defendant's records and, prior to mailing class notices, corrected addresses using the National Change of Address Database maintained by the U.S. Postal Service.  (*See id.*; Castro Decl. ¶¶ 3, 5–7.)  If a notice was returned with a forwarding address, ILYM re-mailed it to the forwarding address, and if it was returned as undeliverable, ILYM attempted to obtain a valid mailing address by performing a skip trace.  (*See* Agreement art. III, ¶ 9; Castro Decl. ¶¶ 8–9.)  This method of distributing relief is adequate.

### c)   Award of Attorneys' Fees

The next factor in the adequacy analysis considers "the terms of any proposed award of attorney's fees."  Fed. R. Civ. P. 23(e)(2)(iii).  Central to this analysis is the extent to which the attorneys' fees are "disproportionate" to the settlement fund.  *See Bluetooth*, 654 F.3d at 947.  Ordinarily, "25% of the fund [i]s the 'benchmark' for a reasonable fee award."  *Id.* at 942–43.  In deciding whether "'special circumstances' justify[ ] a departure" from the benchmark, *id.* at 942, courts typically consider (1) the results achieved, (2) the risk of litigation, (3) the skill required and the quality of work, (4) the contingent nature of the fee and the financial burden carried by the Plaintiff, and (5) awards made in similar cases.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).  In addition to proportionality, courts must scrutinize agreements for any "clear sailing arrangement, under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee," and any "'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class."  *Briseño v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1023 (9th Cir. 2021) (cleaned up).  The amended Rule 23(e) also instructs courts to consider the "timing of payment."  Fed. R. Civ. P. 23(e)(2)(C)(iii).  Even though greater skepticism is appropriate in settlements reached before formal class certification, "courts should [not] unnecessarily meddle in class settlements negotiated by the parties."  *Briseño*, 998 F.3d at 1027; *see also Staton*, 327 F.3d at 952 ("Judicial

review . . . takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk.").

Counsel has requested attorneys' fees equaling one third of the GSA, or approximately $266,666.  (*See* Hawkins Decl. ¶ 50.)  Counsel argues that an upward adjustment of the 25% benchmark award "is justified under the facts of this case for undertaking complex, risky, expensive and time-consuming litigation on a contingency fee basis," and because of their "expertise in class actions[,] [which] weighed heavily in obtaining a benefit to each member of the Class."  (Mot. at 23.)  Counsel further asserts the requested fees are appropriate in light of the results achieved, awards in similar cases, and the class's reaction.  (Mot. at 24, 26–28).  The Court is not persuaded.  This was a straightforward wage-and-hour case without substantial litigation or other exceptional circumstances.  Counsel performed ably, but not exceptionally.  The settlement reflects a result for Plaintiff and the class that is good, but not extraordinary.  The Court therefore finds that a benchmark 25% award is fair and reasonable in light of the results achieved, counsel's efforts in litigating this action, and the risks counsel took in accepting this case. *See In re MGM Mirage Sec. Litig.*, 708 F. App'x 894, 897–98 (9th Cir. 2017) (affirming 25% benchmark fee award where "[t]here were no special circumstances here indicating that the 25% benchmark award was either too small or too large"); *Todd v. STAAR Surgical Co.*, 2017 WL 4877417, at *5 (C.D. Cal. Oct. 24, 2017) (awarding 25% of settlement fund).

The "lodestar cross-check" does not persuade the Court that a 25% award is inadequate.  Courts commonly perform a lodestar cross-check to assess the reasonableness of the percentage award.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyer's investment of time in the litigation, provides a check on the reasonableness of the

percentage award."); *see also In re Bluetooth*, 654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a reasonable percentage award").

Counsel contend that their lodestar fee is approximately $227,960 because they spent 301.2 hours at reasonable hourly rates of $900 (115 attorney hours), $850 (133.4 attorney hours), and $200 (52.8 paralegal hours).  (Hawkins Decl. ¶ 53.)  First, accepting counsel's lodestar analysis indicates their requested fee of $266,666 is unwarranted.  Second, the Court has reviewed the billing records and concludes that the lodestar amount would overcompensate the attorneys in this case, given the good (but not great) result and the able (but not extraordinary) representation of counsel.  *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained").  Particularly concerning to the Court are the $900 and $850 hourly rates.  *See, e.g.*, *Sarabia v. Ricoh USA, Inc.*, 2023 WL 3432160, at *8 (C.D. Cal. May 1, 2023) ("In Los Angeles, the median hourly rate for partners in the 'Employment and Labor' practice area for firms of 501 to 1000 lawyers in size is $677, and the 2022 mean rate is $748.")  Granting Plaintiffs' counsel's fee application in full would "reduce substantially the size of the common fund available for distribution to the plaintiff class" and is not appropriate under the circumstances in this case.  *See id.*

Additionally, the Court will calculate the 25% attorney fee award *after* deductions for counsel's expenses and ILYM's fees.  In other words, to calculate attorney fees in this case, the Court will apply the benchmark to the amount the class recovers.  Calculating a percentage fee and then deducting expenses, as counsel urges, has the unusual effect of reimbursing counsel for their expenses—like transportation, hotels, deposition costs, and photocopying—and then awarding them 25% of their expenses as a fee.  There is no

principled reason to calculate a fee this way.  *See, e.g.*, *Smith v. Experian Info. Sols., Inc.*, 2020 WL 6689209, at *7 (C.D. Cal. Nov. 9, 2020) (calculating benchmark fees by deducting the amount of litigation costs and settlement administrator costs from the settlement amount, and taking 25% of that amount); *In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d at 1182 (same); *Kmiec v. Powerwave Techs., Inc.*, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (same); *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same).  And deducting the settlement administrator's expenses before calculating the fee ensures that class counsel's incentive remains keeping those costs low.

The Court finds counsel's request for $14,411.55 in litigation expenses and $20,000 for ILYM's fees and costs reasonable and well-supported by the evidence presented in their motion.  Deducting these costs from the $800,000 settlement amount, and taking 25% of that amount, the Court awards Plaintiffs' counsel $191,397.11.

In addition to the amount of counsel's fees and costs, the Court must also scrutinize the timing of payment.  *See* Fed. R. Civ. P. 23(e)(2)(c); *see also Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as Class Members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.").  Here, the Agreement provides that "Class Counsel shall be paid any Court approved fees and costs no later than seven (7) calendar days after Defendant provides the Gross Settlement Fund to the Settlement Administrator." (Agreement art. III, ¶ 24.)  "Individual Settlement Payments shall be mailed by regular First-Class U.S. Mail to each Settlement Class member's last known mailing address within seven (7) calendar days after Defendant makes the final settlement payment." (*Id.* art. III, ¶ 17.)  While such an arrangement may allow the settlement administrator to pay counsel before class members, which could "cast a slight shadow on the proposed fee and cost arrangements

. . . given the strong showing of arm's length negotiation and lack of collusion in this case, [any] gap between payments standing alone does not appear so significant as to weigh against granting final approval of the Settlement." *Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at *10 (C.D. Cal. July 24, 2023)

### d)   Any Agreement Made in Connection with the Proposal

A court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The parties have not identified any agreement other than the proposed settlement agreement discussed herein.

### 4.   Equitable Treatment Among Class Members

The final Rule 23(e) factor is the extent that class members are treated "equitably relative to each another."  Fed. R. Civ. P. 23(e)(2)(D).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

There is no issue of equity among class members.  Individual settlement amounts are based on the pro rata share of workweeks that each individual class member was employed by Defendant, which is an appropriate proxy for the degree of harm that the individuals likely suffered due to Defendant's purported misconduct.  This is therefore an appropriate and equitable method of apportioning relief.  Nor are there differences in the scope of release across the class members at large.

**5.    Incentive Award**

"Incentive awards are fairly typical in class action cases" and are "discretionary." *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (emphasis omitted). They "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958–59.  In determining whether an incentive award is appropriate, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and "the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977 (citation omitted).  They also consider "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (quoting *Staton*, 327 F.3d at 947).  Courts should be especially cautious where "the proposed service fees greatly exceed the payments to absent class members." *Radcliffe v. Experian Information Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013).  A $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).

Plaintiff requests an incentive award of $7,500.  (*See* Dkt. 40-2 [Declaration of Paintiff Gagnier] ¶ 12.)   He states that he "participated in many interviews and conferences with class counsel," "provided many documents to class counsel in support of the class claims," helped counsel prepared written questions, and participated in mediation preparation.  (*See id.* ¶ 9.)   In further support of the requested incentive award, Plaintiff notes "the risk of being a Class Representative in a class action under the Labor Code may affect my future ability to get other jobs in this retail industry," and the risks of potential liability for opposing parties' costs and attorneys' fees.  But the work and risks

Plaintiff describes in connection with this case are typical for a class representative and do not justify a departure from the presumptively reasonable award of $5,000. *See Bellinghausen*, 306 F.R.D. at 266. Furthermore, the proposed incentive award of $7,500 would exceed the average class member recovery by over a factor of ten.[3] Other courts have found proposed incentive awards to be excessive in employment class actions where the awards exceeded average class member recovery by smaller factors. *See, e.g., Wilson v. J.B. Hunt Logistics, Inc.*, 2020 WL 11626082, at *4 (C.D. Cal. Nov. 13, 2020) (finding that the proposed service award of $7,500 was excessive when it "would be more than ten times the average class member's recovery of only $577"); *McDonald v. CP OpCo, LLC*, 2019 WL 2088421, at *8 (N.D. Cal. May 13, 2019) (finding that a $15,000 incentive award was outsized at 7.5 times the recovery of average class member). The Court finds that a $5,000 award is reasonable in light of the time and effort Plaintiff spent over the course of this case.

## C.    Response to Notice

As explained, ILYM mailed notice to the 1,150 class members on the settlement class list. (Castro Decl. ¶¶ 6–9.) The notice included phone numbers for ILYM and class counsel if class members had any questions. (*Id.* Ex. A [Notice of Class Action Settlement] at 4–5.) ILYM received only two requests for exclusion, and no one objected to the settlement. (Castro Decl. ¶¶ 4–5.) This indicates very strong overall support for the Agreement and supports final approval. *See, e.g., Hashemi*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that

---

[3] The average payment to class members is approximately $400. (Mot. at 8 ["Following the grant of final approval, and the effective date of Settlement, pursuant to the terms of the Settlement, Settlement Class Members will receive an average payment of approximately $384.51 and highest payment of approximately $1,228.04."].)

low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement. It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

### D.    The PAGA Settlement

Under PAGA, "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations." *Arias v. Superior Ct. of San Joaquin Cnty.*, 209 P.3d 923, 930 (Cal. 2009). An "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c). In bringing a PAGA suit, an employee acts as "as the proxy or agent of the state's labor law enforcement agencies," *Arias*, 209 P.3d at 933, rather than as a representative of a group of people in the class-action sense, *see Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1121 (9th Cir. 2014). Civil penalties recovered in a PAGA action are divided 75% and 25% between the LWDA and the aggrieved employees, respectively. *See* Cal. Lab. Code § 2699(i). And a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Arias*, 209 P.3d at 933.

A court must "review and approve any settlement" in a PAGA action. Cal. Lab. Code § 2699(*l*)(2). The settlement must also "be submitted to the [LWDA] at the same time that it is submitted to the court," *id.*, which "allow[s] the LWDA to comment on the settlement if the LWDA so desires," *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp.

3d 959, 971 (N.D. Cal. 2019) (citation omitted).  "[N]either the California legislature, nor the California Supreme Court, nor the California Courts of Appeal, nor the [LWDA] has provided any definitive answer to" the standard that courts are to use in reviewing a PAGA settlement.  *Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, 253 F. Supp. 3d 1074, 1075 (C.D. Cal. 2017); *see also Haralson*, 383 F. Supp. 3d at 971.  "[A] number of district courts have," however, "applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 971 (citation omitted); *see also O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1134 (N.D. Cal. 2016) ("[T]he Court must evaluate . . . the adequacy of the settlement in view of the purposes and policies of PAGA."); *Williams v. Superior Ct. of L.A. Cnty.*, 398 P.3d 69, 81 (Cal. 2017) ("PAGA settlements are subject to trial court review and approval, ensuring that any negotiated resolution is fair to those affected.").  A court may use a "sliding scale" to evaluate the fairness of the PAGA settlement with the settlement of class claims for Labor Code violations.  *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972.  "For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled."  *O'Connor*, 201 F. Supp. 3d at 1134.

The Court approves the PAGA portion of the settlement, totaling $50,000.  (*See* Agreement art. I, ¶ 26.)  For claims invoking Labor Code provisions that do not "specifically provide[]" a penalty amount, Defendant faced a penalty of $100 "for each aggrieved employee per pay period for the initial violation and [$200] for each aggrieved employee per pay period for each subsequent violation."  Cal. Lab. Code § 2699(f).  The wage statement provision, meanwhile, specifies a penalty—$50 for each initial violation and $100 for each subsequent one.  *See id.* § 226(e)(1).  Importantly, a "court may 'exercise its discretion to award lesser penalties based on the enumerated considerations' in [California Labor Code] section 2699, subdivision (e)(2), which include a determination that imposition of the maximum statutory penalty would result in an award

that is unjust, arbitrary, oppressive, or confiscatory." *Carrington v. Starbucks Corp.*, 241 Cal. Rptr. 3d 647, 669 (Cal. Ct. App. 2018) (emphasis omitted).

Given the penalties that Defendant faced, the litigation risks described earlier, and the discretion of a court to award lesser penalties, the recovery here seems reasonable. The class settlement also helps ensure that PAGA's purpose is satisfied. *See O'Connor*, 201 F. Supp. 3d at 1134. And the LWDA has not contested the settlement. *See Haralson*, 383 F. Supp. 3d at 973 ("[C]ourts have taken into account LWDA's views, or lack thereof . . . ."); (*see also* Hawkins Decl. ¶ 59 [stating that motion for final approval was served on the LWDA on or about September 1, 2023]; Dkt. 38-3 [Declaration of James R. Hawkins in Support of Plaintiff's Motion for Preliminary Approval of the Class Action Settlement] ¶ 56 [stating that notice was given to the LWDA on May 23, 2023]).

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN SUBSTANTIAL PART** Plaintiff's motion for final approval of the settlement agreement. Plaintiff's counsel are awarded $191,397.11 in attorney fees and $14,411.55 in costs, ILYM is awarded $20,000 in costs, and Plaintiff is awarded $5,000 for his service as class representative.

DATED:      January 22, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

**CC: FISCAL**